also known as Machama, Appellant. Mr. Picard for the Appellant, Mr. Weiser for the Appellant. Good morning. Good morning, Your Honor. Your Honor, I'm going to depart a little bit from the format of my brief and start with the easiest legal issue there is here, which is the exports factor issue. Under the Supreme Court case law, and I'm referring to Pew, Rosales-Morales in this court's decisions in head and others cited, there isn't a shred of evidence in this record to show, not a shred, to show that any acts of bribery, of violence, or running an international narcotics importation enterprise occurred after October 31st of 2010. The government's position is simple. They have two parts. The first argument is that he pled guilty to a conspiracy that ran till 2012. But as this court said in the United States v. Turner, the outer date of the conspiracy doesn't define the offense for sentencing purposes. What we look to are what facts are there that occurred after October 31st of 2010. There are none. Their retreat position, their fallback, is this man Zambada, who, quote, testified, unquote, through the presence of an agent, referred vaguely to some undefined letters that Mr. Beltran-Lever sent from jail. Let's examine that. Mr. Beltran-Lever was in jail from January 2008 onward, long before the effective date of the 2010 amendments. Secondly, what are these ephemeral letters? Nobody knows. There's not a shred of evidence in the record as to who those letters went to, what those letters were about. For all we know, Mr. Beltran-Lever, if they existed, may have been complaining about the jailhouse food or sending a birthday card to somebody. The fact of the matter is that those six points, and that's an important six points, cannot be sustained under any circumstances here. Why is that significant? Because if you start with a base office level of 38, and then you have the acceptance of responsibility, and the six points don't add in, that puts him under, far under, a presumptive life range. I want to talk about that acceptance of responsibility issue because that's also important. That's another example of what I contend is clear legal error. Can I just ask you one question about the expose factor? So if you credit the notion that there would that end your expose factor argument in your view? Absolutely not. As I said, Your Honor, what is that? First of all, what is that ephemeral correspondence? We don't know. The claim presented by the government falls within the classic indicia of unreliable hearsay. A, unsworn statements made out of court by the cleric that was never subject to cross-examination, at the cleric facing life imprisonment with a long history of reprehensible violence. Ask Mr. Zambada, who met Alfredo Beltran-Libre, if you believe the agent, one time in the course of his life. He's a shadow presence. He's what I call window dressing. What does he talk about? What he allegedly talks about is Mr. Beltran-Libre sent letters from jail. So what? What are those letters about? Is he directing violence? We don't know. Because there's no suggestion in the record as to what they were. And that's the record that they put together because they accepted the judge's invitation to, if I can borrow their phrase, quote, streamline this process, or what I would call justice on the cheap. All those letters could possibly – we don't know. We don't even know if those letters existed. You know why Judge Trinovasi? Because according to the agent, Zambada had a bribe on the most corrupt Mexican prosecutor. When I use corrupt, that's another term the government uses below. They describe the whole Mexican justice system as corrupt. I'll agree with that. Zambada had a bribe, according to the agent, somebody to get these ephemeral letters that never once surfaced. There is no – those letters, what do they show? They're gossamer. Because nobody knows what the contents are. Nobody knows who they were sent to. So they can't – they just don't substantiate any claim up to five hours in hand. Did you say we don't know to whom they were sent? Did you say we don't know to whom they were sent? No. What I said in my brief, Judge Ginsburg, is as follows. There is – we have this unsworn, out-of-court statement related by the agent. We don't know who those letters were sent to. We don't even know if those letters exist. We don't know what those letters said. We don't even know when the letters were sent. He was in jail. He was in jail from – my client was in jail from January of 2008. That's another important fact, because the amendments don't take place until November 1st, 2010. So they've got – there just is no evidence to substantiate that. So as to the acceptance of responsibility, that should be an easy call for this Court. And why do I say that? Because up through October of 2016, when Judge Leon – and I say Mr. Depp – has rather noisily rejected the proposed Level 42 sentence, everybody who was on board, including the government and the probation office, were three points off for acceptance of responsibility. My client never got up there and testified at that, what I call, a Potemkin village of a sentencing hearing and denied and falsely made statements. All he did was cross-examine the government's agents. It's the government's burden to substantiate the enhancements. It's not his burden to say that they're right. It's his burden to disprove them. And they didn't – so he cross-examines the agents who are sitting there relating this classic hearsay from people facing life sentences with every incentive to curry favor with the prosecution. My client was denied the right of cross-examination, which he asked for twice. It's not a ground to deny a leadership enhancement, particularly – I'm sorry, an acceptance of responsibility credit, particularly here. Because when Judge Leon denied the acceptance of credit judgment of us, and what he said in the record was this, I'm denying the credit because of all these enhancements. That's no ground to deny an acceptance of responsibility credit, because the defendant contested, as he had a constitutional right to do, the validity of the enhancements. He didn't get up there and falsely testify, unlike the cases cited by the government. He just put them through the burden. And as I said to you, they failed miserably with respect to that burden. It's legal error to deny the acceptance of responsibility credit, particularly under the circumstances where everybody was on board with that up through October of 2016. The only thing that changed was they had a status call, and the district judge made it quite clear. It stays with the life sentence all the way. It's the guidelines and no guidelines. And you don't have to – frankly, we cited cases in our reply brief that the district judges had issues in the past with the sentencing guidelines. Well, for better or for worse, they're here. They should be adhered to. At least they should be respected. That doesn't appear in the record. So the acceptance of responsibility credit should have been given to Mr. Valtrin-Leva. So acceptance of responsibility comes into play if you add it on to the erroneous imposition of an enhancement, right? Because you need to get all the way down below 43. It's easy. Let me demonstrate it for you. If you took – let's draw that level 38. Everybody agrees that's the base offense level. Skip those six points for the post-November 2010 guidelines because they're inapplicable. They're inapplicable. If you give three – Because of ex post facto. That's right, ex post facto. If you take three points off the 38, which everybody was prepared to do through October of 2016, that takes them to a 35. Now, I've said in my brief that we – they never proved the gun bump. I mean, that cock and bull LIDA story, I spelled it out. They walked that one back. I spelled that out in our brief. That's two points. If they don't get the leadership, that's four points at best. If they did get it, and it would be error on this record to allow it, they still don't get anywhere near a presumptive life sentence. So this prejudice here is significant. So can I ask you, before your time runs out, you made an argument in your opening brief that it was erroneous to disallow withdrawal of a guilty plea. It was erroneous what? To not allow withdrawal of a guilty plea. That's right. And then I didn't see that argument in your reply brief. I didn't treat him in a reply brief, Your Honor. I had space limitations. The only observation I would make is this, and I would hope somebody would ask me that question. The government misguided this side of the law, which they had a penchant to do in their brief. They said it's a sine qua non that you say I am innocent of the offense. They say that. That's not what the law says. That's an element that can be considered. In this case, in this case, Mr. Balcon-Leva saw what was happening. He saw a gross injustice. I contend that this was a railroad into a life sentence. When he sought to withdraw the plea, he didn't say I'm factually innocent. He didn't do that. What he said was I was coerced into doing this. I wasn't given a Rule 11 colloquy, and there's a fair amount of case law that courts are required to follow the Rule 11 colloquy. And he said what I'm guilty of, what I should not have been brought here under the law especially, he argued a legal defense. He didn't assert a defense of factual innocence. So my position is I didn't address the Rule 11 given the word count and the case constraints, but I rely on the brief. And what I just said to you is that the government's position is erroneous. The case law is to the contrary, that you don't have to say squarely. It's not a sine qua non to say I must say I am completely innocent. He didn't say that. I see that my time is up. I'm happy to answer any other questions. Thank you. We'll give you a few minutes on rebuttal. May it please the Court, William Glasser for the United States. I'd like to start with the ex post facto issue that counsel addressed first and point the Court to three specific places in the record that support the notion that Mr. Beltran-Leyva was actually engaged in controlling the drug organization after he was incarcerated. I still believe that as a legal matter we're correct on the law that because the conspiracy actually continued up through the time of the indictment that he actually has to affirmatively show withdrawal in order to not be part of that conspiracy. The Turner case that was discussed in the briefs was a very different case in which the object of the conspiracy was completed and the question was whether simply concealing the conspiracy was enough to continue it for purposes of statute of limitations. But all that, the sort of legal question aside, the law is on our side, but the legal question aside, the facts here show. So when you say the legal question aside, can I just ask you, so your view of the law is that as long as the conspiracy postdates the change in the guidelines, it doesn't matter if the conduct giving rise to the enhancement postdates the change in the guidelines? Absolutely, Your Honor, that's correct. And the Turner case, again, we said that the charge, so if the government says it continues up through 2012 and the evidence doesn't support that, if the conspiracy is complete by that point, then just the date stated in the charge is not enough. However, this is a conspiracy. It wasn't a conspiracy. Well, it was a conspiracy in that case, but the object was complete. Here the conspiracy clearly continued beyond his incarceration. And what's the evidence? I'm sorry, go ahead. Sure. Why does it make sense under the ex post facto clause to only focus on how long the conspiracy persists rather than focusing on the conduct that gives rise to the enhancement? Well, Your Honor, this is similar to the one book rule that's discussed to a great degree in the notes in B.1.11, which is the sort of issue of when can you apply an enhancement that was enacted after the conduct that underlay it. And the idea is that the person is on notice, because he continues in the conspiracy past those 2010 amendments, that he's on notice that by continuing to be in the conspiracy, that he is subject to those enhanced penalties. But I don't think that this Court needs to resolve that issue. And he's on notice, and then therefore he needs to withdraw? That's correct, Your Honor, absolutely. And the Supreme Court in Smith made clear that it's the defendant's burden to withdraw by participating in a conspiracy, in this case a very violent conspiracy, in which he was supervising the killing of members of other drug trafficking organizations. He had an affirmative duty to withdraw. But he actually, in fact, affirmatively continued directing the activities of others in the conspiracy. And I can point to three places in the record to support that. First of all, Mr. LaCarre spoke about the letters, and that's at App 420. That's some testimony from Villarreal that, pardon me, some statements from Villarreal's 302 that talked about him sending messages through his sister while he was in jail. But the second place that this was discussed was at App 265 through 69. And that was from Mr. Zambada, and I have that here in front of me. There was actually a question about what the messages were that were being conveyed. They were being conveyed sort of indirectly through transcripts of visits that Mr. Beltran-Leyva received. And the question was asked what the general nature of the messages were, and the answer was Mr. Zambada-Garcia stated that the general messages were just continue running the Beltran-Leyva organization for the defendant. And those specifically were passed on to Mr. Beltran-Leyva's son and to another person called Chapo Isidro. And there was testimony that Chapo Isidro was someone who was engaged in methamphetamine trafficking for Mr. Beltran-Leyva. The third place I'd like to point the court to, and I apologize, I didn't specifically cite this one in my brief, but it's in the appendix at page 67, and this is quoting from the underlying extradition documents. And in the underlying extradition documents, there was evidence that in 2011, so this clearly ties it to a time after October 2010, in 2011, that there was another member of the organization said that they were receiving messages from Mr. Beltran-Leyva in prison regarding the direction of the drug trafficking conspiracy. So this court doesn't need to address the more complicated legal issue. I mean, I think this law is on our side. But in this case, there was adequate evidence to indicate that he was not just a passive member, which would still be enough, but an active member of the conspiracy after 2010. And for us to take account of that evidence if the district court didn't, as far as we know, rely on that as the basis for the enhancements and because it's plain error, is that? Your Honor, yes. I mean, the district court had no opportunity to determine whether or not there was an ex post facto violation. So he bears the burden in order to prevail on this claim. If I may then turn to the acceptance of responsibility credit that counsel addressed next. First of all, the guidelines make clear that this is something in which the district court is entitled to great deference. That's in footnote 5 of 3E1.1. And this court reviews for abuse of discretion. So the question is whether there was any reasonable basis for the district court to deny an acceptance of responsibility credit. And the first reason that we've pointed to is that AP 164, when asked whether or not he was one of the leaders of the Beltran-Leyva organization, Mr. Beltran-Leyva said, no, sir. He denied being a leader of the organization. And yet the district court subsequently found that he was, in fact, a leader of the organization. He was the number two member of this organization. He directed hundreds of people who were underneath him. And that was one basis on which the district court denied the acceptance credit. He also, as Mr. LaCar mentioned this morning, he also claimed in seeking to withdraw his guilty plea that he had actually pleaded guilty under duress. Now, that was directly inconsistent with his statements in the Rule 11 colloquy. And the district court had simply no basis on which to credit that claim. But he also has never claimed at any time that he was factually innocent. He chose to plead guilty in this case. And he has at no time asserted that he was, in fact, innocent of being a member of the Beltran-Leyva drug trafficking organization. So whether or not that's seen upon known, it is something that this court has said is one of the factors that the district court can consider. And the district court in this case did not abuse its discretion by concluding that he was not entitled to acceptance. Can I ask you about the withdrawal of the guilty plea? Sure, yes. And I'm sorry, I sort of looped that in. Yeah, just focusing on our decision. So in Ford, we started off by recognizing the withdrawal of the guilty plea before sentencing is generally liberally granted. Correct. And as I understand the proceedings below, there was no mention in the Rule 11 colloquy about the possibility of forfeiture. That's correct, Your Honor. So that's not in keeping with Rule 11. That's correct. That was a Rule 11 error. Right, and so then the question becomes, is that the sort of significant thing that ought to be enough to give rise to the kind of liberally granted notion that we established in Ford? And your argument, I think, was that it shouldn't be in these circumstances because the indictment dealt with forfeiture. Correct. But suppose that we thought – I know you'll resist this, but just suppose that we thought that the reference in the indictment – the reference to the fact that he read the indictment isn't enough. Then you weren't – you don't make the argument that just failing to address forfeiture at all is just not a big deal. Well, Your Honor, I thought I had essentially made that argument, and I'm happy to make it now. But I think if I can just kind of – No, make it in the brief. I mean, I didn't see that argument. It seemed like you were resting on the notion that we're okay on the failure to mention forfeiture because there was a reference in the indictment, and the indictment talks about forfeiture. Your Honor, I spoke more broadly about the standard from Ford, whether or not this is something that's one of the core inquiries of Rule 11. And I apologize if I didn't make it clear in my brief that I understood our position to be that this forfeiture is not something that is one of the core inquiries of Rule 11. And if I can kind of step back here, the case law from this court on which Ford relied was primarily from this court's en banc decision in the 1975 case. And in 1975, the text of Rule 11 was significantly different than it was today, and essentially it was the due process standard. And so this court's early cases, ensuring that a guilty plea is knowing and voluntarily entered – I mean, of course, if there's not sort of compliance with Rule 11, then before sentencing, the person ought to be allowed to withdraw their guilty plea. But Rule 11, as you know, has expanded significantly since then. But pre-Ford. Yes, Your Honor. Pre-Ford, although there have been additional amendments. The big move was before Ford, and we still have the language in Ford about liberally granting. That's correct. But Ford also sort of – I mean, you could say it speaks out of both sides of its mouth. Ford also says that it shouldn't be – that ordinarily it shouldn't be allowed if it – excuse me, it says will not reverse – the court said it will not reverse a trial court in its application of Rule 11 except when it has failed to address the rule's core inquiries. Yeah, and so on core inquiry and kind of substantial compliance, all these factors get into roughly some sense of how big a deal is it. Correct. Absolutely. With forfeiture, if you have a case in which forfeiture is hundreds of millions of dollars, and here it was 500 – over $500 million, right? Yes. Yes, Your Honor. It just – it seems like it's at least conceivable that failing to mention forfeiture could be a big deal to somebody because if they don't have any idea that they're going to lose half a billion dollars, then maybe that would affect the calculus on whether to plead guilty. If I'm going to answer the question, I believe I'm out of time. Absolutely. If they were unaware of it, I would agree with you, but there's no indication here that he was unaware and when, in fact, it was included in the indictment. But the only argument you have about why he was aware or should have been aware is the reference to the indictment, that he read the indictment. Your Honor, yes, that's the only thing that we've cited. I'm really not sure to what extent forfeiture was discussed prior to the plea. There was a lot of back and forth, and I'm not sure to what extent forfeiture was discussed. And so on the indictment, can I just ask you one follow-up question? Sure. Which is it seems like under Ford – in Ford itself, there was – the government made the argument that it's okay not to have gone through the nature of the charge because that was something that was in the indictment. And we said, well, that's not enough. Just the fact that it was in the indictment isn't enough. And so why doesn't that logic tend to counter your notion that it's okay not to mention forfeiture because forfeiture was mentioned in the indictment? Well, Your Honor, really the only thing that the court would have instructed him in the Rule 11 colloquy is you are potentially subject to forfeiture. And that is exactly what he was told in the indictment. So I think it's different than sort of the larger question of understanding the nature of the charges that was at issue in Ford. Thank you. I have a question. Go ahead. I want to take you back to the expos facto clause for just a moment. Yes, Your Honor. I take your point that – to be your point that the evidence that the defendant continued to direct or have a role in directing the conspiracy without having affirmatively withdrawn makes him liable for acts that occurred after the change in the guidelines. Is there any evidence of bribery after that change? Your Honor, there is nothing in the record that – in this record, no. I mean, the drug trafficking organization – This is the record we have. Correct. The drug trafficking organization was huge and it was ongoing, but no, there's nothing in this record to indicate bribes or the other challenge enhancements. So does your argument extend to the point that he's liable for bribery that occurred before the change in the guidelines because he didn't withdraw at or after the change in the guidelines? That's correct, Your Honor. That's a rather far reach. Well, Your Honor, I don't think so. Under the Supreme Court's law regarding conspiracy, the Smith case, this court can look at where the person remains responsible for everything that has happened in the conspiracy prior to the time of their withdrawal. And I guess it's also plain error. That's correct.  Absolutely, Your Honor. I think that even if this court considered it a close question, it wouldn't rise to the level of plain error. Okay. I think in the cases you're referring to, typically the issue is about the quantity of drugs. And having set the conspiracy in motion, it's quite reasonable to expect that the quantities would continue and count against the defendant. This is a little bit different with specific acts. Well, Your Honor, he did supervise the paying of millions of dollars in bribes and did supervise the killing of – Correct, Your Honor. Yes, and he continued – we have the affirmative evidence that he continued to direct the conspiracy. He didn't tell the conspiracy to stop doing that. Well, we don't know that it did it, though. That's the point, right? Well – We know that it did continue to do it. Your Honor, there is evidence in the record of the ongoing war between the Veltran Leyva organization and the Sinaloa cartel. That is included in the PSR, and we cited to it in the brief. But those are not bribes. That's correct, Your Honor. So that would support the violence enhancement, but not the bribery enhancement. Okay. Thank you. Thank you. All right. Counsel will give you a couple of minutes. So if we can indulge here – oh, I have two minutes. Yes. Judge Ginsburg, let me try to assuage your concerns. First of all, guidelines require the defendant have tried to bribe somebody. Secondly, personal participation. Let me read into the record very quickly from page 265 to 266 what they're telling you about Mr. Beltran Leyva's participation post-2008, January 2008. Did Garcia provide any evidence of any statements? Yes. How did he know that the defendant continued to leave? After the defendant's arrest, Zambada Garcia paid the prosecutor's office to receive transcripts of recordings of visitors. And did he review these transcripts? Yes. And what did they reveal? Instead of these transcripts revealed, the defendant was said to have coded language, at which point Mr. Balarejo objected and said, where is this information? It hasn't been produced. January of 2008 to October 31st of 2010, that's a long stretch while my client was languishing in jail, to try to put a life imprisonment on a guy where there isn't a shred of evidence of bribery or any of these other post-2010 enhancements. Judge Srinivasan, you asked about Turner before. I'm sorry, you did ask about Turner. There isn't any act of concealment here. No, indictment doesn't allege acts of concealment, and there isn't any evidence in that Potemkin village of a sentencing hearing. My client tried to conceal anything. So it's quite a stretch for them to try to hang their hat on Turner when the indictment, he pled guilty to a conspiracy. He didn't plead guilty to doing these acts after October of 2010. Now, I think for leadership, the fact of the matter is they've got an LRE problem and a FEOS problem, but district court judge did not cite anything that Mr. Beltran-Livas said when he pled guilty as a basis for denying him the acceptance of responsibility. I hang up on that. But district judge decided to hang him and decided to deny him the acceptance of responsibility credit because of the enhancements, not because of any statements he made at the time of this plea. Lastly, you asked Judge Srinivasan about forfeiture. $570 million based on the word of an addict, and guess what? I made an error in my reply brief. Page 4, page 4 of my supplemental appendix, that's where I should have cited Mr. Villarreal, that con man poseur of a cop. What the government said, he saw 1 to 2 shipments, not 7 to 10 shipments over a period of time, 1 to 2 shipments, and that's how they extrapolate $579 million. Nobody gave my client any idea how this forfeiture calculation was going to work out, and it's as unreliable as everything else in this sentencing record. So I ask in closing that you consider the fact that Judge Leon showed a predisposition to light this sentence up from day one, from October 2016, and remand it to a different judge, because I respectfully suggest, and it's not my practice to throw a brick bat at a federal judge, but I respectfully suggest that he would have a lot of trouble separating his prior decision-making from a remand proceeding. Thank you. We'll take the case under advisory. Thank you.
judges: Rogers, Srinivasan, Ginsburg